UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BEAZLEY UNDERWRITING, LTD,<br><br>                    Plaintiff,<br>          v.<br><br>MAX & MIA REALITY, LLC, et al.,<br><br>                    Defendants. | CIVIL ACTION NO. 3:22-CV-1404<br><br>(MEHALCHICK, J.) |

**MEMORANDUM**

Presently before the Court are three motions for summary judgment, each raising similar issues. (Doc. 52; Doc. 55; Doc. 58). Doc. 58). This matter stems from an insurance dispute arising from a fire ("the Fire") damaging a commercial building ("the Building"). According to Plaintiff Beazley Underwriting, LTD ("Beazley"), Beazley issued an insurance policy ("the Policy") to Defendant Max & Mia Realty, LLC ("MMR") which provided for scheduled coverage with limits on an item-by-item basis by location. (Doc. 59, at 1-2). MMR and its retail insurance broker, Third-Party Defendant E.K. McConkey & Co. ("McConkey") (together, "Defendants"), argue that the Policy provides blanket coverage and requires Beazley to pay MMR significantly more than if the policy provided scheduled coverage. (Doc. 54, at 3-9; Doc. 56, at 7-15). For the following reasons, Beazley's motion for summary judgment will be **GRANTED in part** and **DENIED in part**. (Doc. 58). McConkey and MMR's motions for summary judgment will be **DENIED as moot**. (Doc. 52; Doc. 55).

I.      **BACKGROUND AND PROCEDURAL HISTORY**

Unless otherwise indicated, the following factual summary is taken from the parties' filings relevant to the instant motions for summary judgment. Beazley initiated this action by filing a complaint seeking declaratory relief and asks this Court to declare "that the Policy is

subject to a [s]cheduled [l]imit of [l]iability which applies to coverage for the [Building]."
(Doc. 1; Doc. 59, at 7).

Beazley is a United Kingdom corporation that is the sole member of Syndicate 2623.[1]
(Doc. 1, ¶ 11; Doc. 60, ¶ 1; Doc. 67, ¶ 1; Doc. 60-1, at 11; Doc. 57, ¶ 9). Syndicates 623 and
2623 subscribed to the Policy, No. W25073D210501, issued to MMR, a real estate limited
liability company with its principal place of business in Pennsylvania, for the period of
October 11, 2021 to October 11, 2022. (Doc. 1, at 1-3; Doc. 60, ¶ 2; Doc. 67, ¶ 2; Doc. 72, ¶
2). Syndicate 2623 subscribed to 82% of the risk and Syndicate 623 subscribed to 18% of the
risk.[2] (Doc. 60, ¶ 3; Doc. 60-1, at 24; Doc. 67, ¶ 3; Doc. 72, ¶ 3). McConkey is an insurance
agency that served as MMR's insurance broker to "act as [MMR's] exclusive representative
in the marketplace to locate. . . insurance coverage." (Doc. 60, ¶ 5; Doc. 60-1, at 89, 221-224;
Doc. 67, ¶ 5; Doc. 72, ¶ 5). McConkey used broker Ryan Turner Specialty ("RT Specialty")
to obtain insurance on behalf of McConkey's clients. (Doc. 60, ¶ 7; Doc. 67, ¶ 7; Doc. 72, ¶
7).

Prior to the issuance of the Policy, Beazley had issued MMR commercial property
insurance policies since 2017.[3] (Doc. 60, ¶ 14; Doc. 60-1, at 93; Doc. 67, ¶ 14). On November
4, 2021, Beazley sent an email enclosing a copy of the Policy and Statement of Values

---

[1] McConkey disputes this allegation. (Doc. 72, ¶ 1). The basis for the allegation that
Beazley is the sole member of Syndicate 2623 is a declaration by Christopher S. Myles
("Myles") and McConkey argues Myles did not have personal knowledge and relied on
inadmissible hearsay. (Doc. 72, ¶ 1).

[2] McConkey disputes this allegation. (Doc. 72, ¶ 3). McConkey asserts that Beasley
has not properly identified what these risk percentages mean and has not shown that they are
relevant or material to this case. (Doc. 72, ¶ 3).

[3] McConkey disputes this allegation. (Doc. 72, ¶ 14). According to McConkey,
"certain Underwriters at Lloyd's London" effectuated MMR's insurance policy from 2017 to
2021. (Doc. 72, ¶ 14).

("SOV") to RT Specialty, which included on its first page, a form that denoted the Policy as "A Scheduled Policy."[4] (Doc. 60, ¶ 38; Doc. 60-1, at 15; Doc. 67, ¶ 38;). The Policy also contained a "Scheduled Limit of Liability Clause" Endorsement, of which the parties dispute the effect. (Doc. 60, ¶ 47; Doc. 60-1, at 28; Doc. 60-1, at 56; Doc. 67, ¶ 47; Doc. 72, ¶ 47). After review of the Policy, in which McConkey made note of the Scheduled Policy Form, McConkey approved the Policy without any proposed changes.[5] (Doc. 60, ¶¶ 46-48; Doc. 60-1, at 102-105; Doc. 67, ¶¶ 46-48). MMR did not closely review the Policy.[6] (Doc. 60, ¶¶ 49-50; Doc. 60-1, at 103-104; Doc. 67, ¶¶ 49-50; Doc. 72, ¶¶ 49-50).

On March 5, 2022, the Fire engulfed the Building, causing significant damage. (Doc. 60, ¶ 51; Doc. 60-1, at 315; Doc. 67, ¶ 51; Doc. 72, ¶ 51). On the same day, McConkey submitted a "Property Loss Notice" on behalf of MMR, seeking coverage for the damage from the Fire. (Doc. 60; ¶ 52; Doc. 60-1, at 315-321; Doc. 72, ¶ 52; Doc. 72, ¶ 52). Sedgwick, an independent adjuster firm appointed by Beazley, investigated the fire and sent MMR a reservation of rights letter, dated April 15, 2022, which noted that "the Policy reflects a value of $3,413,330 for the fire-damaged building and $440,740 for business personal property[, and b]ased on the Policy language above, in particular paragraph 2.B. of the Schedule Limit of Liability Clause, this would be the maximum recoverable amount under the Policy." (Doc.

---

[4] McConkey disputes that the SOV sent in this email is the only relevant SOV. (Doc. 72, ¶38).

[5] McConkey notes that the policy contains the phrase "Scheduled Limit of Liability Clause" but contests that this is a "Scheduled Policy Form." (Doc. 72, ¶ 47). McConkey concedes that it reviewed the policy and did not advise MMR of any issues with the Policy. (Doc. 72, ¶¶ 46-48).

[6] Beasley contends MMR did not review the policy at all. (Doc. 60, ¶¶ 49-50). MMR and McConkey deny that MMR did not review any of the policy but concede that MMR did not closely review the policy. (Doc. 67, ¶¶ 49-50; Doc. 72, ¶¶ 49-50).

60, ¶ 53; Doc. 60-1, at 291; Doc. 67, ¶ 53; Doc. 72, ¶ 53). On March 14, 2022 and March 15, 2022, McConkey sent emails to RT Specialty, stating that the Policy provided blanket coverage, not scheduled coverage. (Doc. 60, ¶ 54; Doc. 60-1, at 298-305; Doc. 67, ¶ 54; Doc. 72, ¶ 54). On or around August 9, 2022, Beazley issued payment to MMR in the amount of $3,761,809.96, calculated by referring to Location 1-1 on the SOV.[7] (Doc. 60, ¶¶ 60-61; Doc. 60-1, at 307, 318-320; Doc. 67, ¶¶ 60-61). Beazley seeks summary judgment on its claim for declaratory relief, stating that the Policy provides scheduled coverage. (Doc. 59). MMR and McConkey seek summary judgment finding that the Policy provides blanket coverage. (Doc. 52; Doc. 55). The parties have submitted briefing on their motions for summary judgment and the Court held oral argument in this matter on April 28, 2025, during which the parties each provided further argument on their motions. (Doc. 54; Doc. 56; Doc. 59). The motions are thus ripe for disposition.

## II.    LEGAL STANDARDS

### A.    MOTION FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In deciding a summary

---

[7] McConkey admits it received a payment in the amount specified but denies it came from Beasley. (Doc. 72, ¶ 60). Instead, McConkey contends the payment came from undefined "Underwriters." (Doc. 72, ¶ 60). McConkey also denies that the building's location is specified in the SOV. (Doc. 72, ¶ 61).

judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid

summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential).

### B. INSURANCE CONTRACT INTERPRETATION

Under Pennsylvania law, "the interpretation of the scope of coverage of an insurance contract is a question of law properly decided by the court." *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999). The Supreme Court of Pennsylvania has instructed that:

> Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

*Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (1983) (citations omitted). "In interpreting an insurance policy, a court must ascertain the intent of the parties as manifested by the language of the written agreement." *Stevens Painton Corp. v. First State Ins. Co.*, 746 A.2d 649, 657 (Pa. Super. Ct. 2000).

Moreover, "[c]ourts interpret coverage clauses broadly 'to afford the greatest possible protection to the insured,' and, accordingly, they interpret exceptions to an insurer's general liability narrowly against the insurer." *Verticalnet, Inc. v. U.S. Specialty Ins. Co.*, 492 F. Supp. 2d 452, 456 (E.D. Pa. 2007) (quoting *Westport Ins. Corp. v. Bayer*, 284 F.3d 489, 498 n.7 (3d Cir. 2002)). The "insurance policy must be read as a whole and construed according to the plain meaning of its terms." *C.H. Heist Caribe Corp. v. Am. Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir. 1981). Furthermore, the court must enforce the plain language of the policy if its terms are clear and unambiguous. *Standard Venetian Blind*, 469 A.2d at 566 (citation omitted).

## III. DISCUSSION

### A. THIS COURT HAS SUBJECT MATTER JURISDICTION

McConkey contends that this Court does not have subject matter over this case because Beasley has failed to show complete diversity of citizenship. (Doc. 56, at 10-12). Beazley disagrees and argues that it has shown all relevant parties are diverse. (Doc. 75, at 6-10). Federal courts may exercise diversity jurisdiction over actions where (1) the amount in controversy exceeds $75,000, and (2) the parties to the suit are: citizens of different states, citizens of a State and citizens or subjects of a foreign state, citizens of different States and in which citizens or subjects of a foreign state are additional parties, or a foreign state as plaintiff and citizens of a state. 28 U.S.C. § 1332(a). Section 1332 requires complete diversity, meaning that every defendant must have different citizenship than every plaintiff. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 (1990). The party invoking diversity citizenship bears the burden of proving that the amount in controversy and diversity of citizenship requirements are satisfied. *McCann v. Newman Irrevocable Tr.,* 458 F.3d 281, 286 (3d Cir. 2006).

Federal courts have struggled to determine issues of subject matter jurisdiction in cases involving Lloyd's insurance policies, due to the unique structure of the Lloyd's business model. *See CNX Gas CO. L.L.C. v. Lloyd's of London*, 410 F. Supp. 3d 746, 748 (W.D. Pa. 2019). Lloyd's acts merely as a forum for potentially thousands of underwriters to buy shares of risks, which "makes it difficult to execute the citizenship analysis required to determine diversity jurisdiction." *CNX Gas*, 410 F. Supp. 3d at 748. The Western District of Pennsylvania has described the Lloyd's insurance model in a detailed manner as follows:

> Lloyd's neither issues insurance policies nor subscribes to them. It merely provides a marketplace where its members can underwrite them. Lloyd's members who subscribe to shares of risk by underwriting insurance policies are referred to interchangeably as "underwriters" or "Names." The identities of Names are kept confidential. Names increase the efficiency of the market and combine resources by forming groups called "syndicates," unincorporated groups of investors who appoint Names on their behalf Syndicates exist for one year, dissolve, and then reconstitute. Each is identified by a number. Syndicates

7

do not manage their own investments as a collective. Rather, the Names of each syndicate appoint one from among them to serve as the managing agent of the syndicate. The appointed Name is referred to interchangeably as "lead underwriter" or "active underwriter." The lead underwriter represents the collective interest of the Names comprising that syndicate. The lead underwriter buys and sells insurance risks. If successful, it brings profit to its syndicate. Similarly, a Name profits from premiums it receives.

*CNX Gas*, 410 F. Supp. 3d at 748-49.

To obtain an insurance policy, an individual contacts a broker, who insures the risk "through lead underwriters acting on behalf of their syndicates." *CNX Gas*, 410 F. Supp. 3d at 749. A contractual relationship is not formed between the Syndicate or Lloyd's, but rather between the insured and the individual Names comprising the Syndicate. *CNX Gas*, 410 F. Supp. 3d at 749. Thus, only the Names, not Syndicates, may be sued under an insurance policy. *CNX Gas*, 410 F. Supp. 3d at 749.

When posed with the question of how to characterize the citizenship of Syndicates for the purposes of establishing diversity jurisdiction, the majority view among the circuits is that when a Syndicate is sued, the citizenship of every Name comprising the Syndicate is relevant for diversity purposes, not merely that of the Name serving as lead underwriter. *CNX Gas*, 410 F. Supp. 3d at 754 ("The United States Courts of Appeals for the Second, Seventh, and Eleventh Circuits [. . .] form the majority regime. They take the view that when a syndicate is sued, the citizenship of every Name comprising the syndicate counts, not merely that of the Name serving as lead underwriter."). Within the Third Circuit, courts have taken the majority view and require complete diversity to exist between all of the Lloyd's Names underwriting the policy and the opposing party. *See CNX Gas*, 410 F. Supp. 3d at 755-56 (holding that complete diversity did not exist because "[o]nly the identity of the Names comprising Syndicates 1084, 9223, 4141 and 72.6 percent of Syndicate 33 are established. The Names

comprising the remaining 27.4% of Syndicate 33 remain a mystery. Importantly, the remaining 27.4% of Syndicate 33 allegedly consists of over 1,800 Names"); *see also Transamerica Corp. v. Reliance Ins. Co. of Il.,* 884 F. Supp. 133, 138 (D. Del. 1995) (stating "[o]ther district courts have analyzed the same question under similar facts and determined that the relevant citizenship is that of all the syndicate members"); *see also Those Certain Underwriters at Lloyd's London v. Sophisticated Invs. Inc.,* No. 2:20-CV-3592-KSM, 2022 WL 507437, at *3 (E.D. Pa. Feb. 18, 2022) (finding that a plaintiff failed to establish subject matter jurisdiction where the plaintiff brought suit on behalf of all four Syndicates to a policy but only named one syndicate that was responsible for 40% of the policy and had a sole Name underlying it because the court had to assess the citizenship of *every single Name* that underwrote the policy at issue).

The Eastern District of Pennsylvania considered a named plaintiff's argument that the court need only consider the citizenship of Brit UW Limited, the sole member of one of the four Syndicates that subscribed to the policy in question, because that was the only Name identified in the complaint. *Sophisticated Invs.*, 2022 WL 507437, at *3. That court rejected this argument, reasoning that the named plaintiff did not argue they brought suit on behalf of the named Syndicate alone, and "even if they had, the plain language of the Complaint shows that Plaintiffs brought suit on behalf of every Name that subscribes to [the policy], not just [the named syndicate]" *Sophisticated Invs.*, 2022 WL 507437, at *3. To justify this conclusion, the court noted that the case's caption identified plaintiffs as "Those Certain Underwriters at Lloyd's, London who Subscribe to [the policy]" *Sophisticated Invs.*, 2022 WL 507437, at *3. It relied on other courts which "have held that nearly identical captions indicate that every single Name that underwrote the policy was party to the lawsuit and relevant to the diversity

analysis." *Sophisticated Invs.*, 2022 WL 507437, at *3; *see also CMGK, LLC v. Certain Underwriters at Lloyd's, London Subscribing to Policy Number ME100504*, Civil Action No. 1:21-cv-02289, 2021 WL 2587997, at *3 (D.N.J. June 24, 2021) (stating "[b]ecause the instant Complaint has been brought against 'Certain Underwriters at Lloyd's London Subscribing to Policy Number ME100504,' the citizenship of all names within Syndicates 510, 1880, and 4141 must be considered for purposes of diversity jurisdiction"). Thus, the court dismissed the case for lack of subject matter jurisdiction, holding that "Plaintiffs' failure to identify and provide citizenship information for all the Names makes it impossible for the Court to determine whether there is complete diversity among parties." *Sophisticated Invs.*, 2022 WL 507437, at *4.

Courts' inquiries into the role that unknown citizenship of a Syndicate plays in a diversity analysis has turned on the caption, as a reflection of the intent of the parties. *See Sophisticated Invs.*, 2022 WL 507437, at *3 (finding that when a case's caption identifies plaintiffs as "Those Certain Underwriters at Lloyd's," the citizenship of all Syndicates insuring the Policy is relevant for diversity purposes because that language implies that the suit relates to "every Name that subscribes to [the policy], not just [the named syndicate]"); *CMGK, LLC*, 2021 WL 2587997 (finding "[b]ecause the instant Complaint has been brought against "Certain Underwriters at Lloyd's London Subscribing to Policy Number ME100504," the citizenship of all names within Syndicates 510, 1880, and 4141 must be considered for purposes of diversity jurisdiction"); *CNX Gas Co.*, 410 F. Supp. 3d at 755-56 (collecting cases and stating "[g]iven that Plaintiff's Complaint pleaded all the Names who underwrote the COW Policy, it follows that Defendants must identify the citizenship of all the Names to permit this Court to exercise diversity jurisdiction"). However, this Court was unable to locate

even one case where a court determined that a Syndicate not named in the complaint nor referred to in the caption through the inclusion of the catch-all "Certain Underwriters" phrase was deemed to have been party to the lawsuit and relevant to the diversity analysis. This holds true even in cases where a voluntary stipulation indicates that all underwriters, including members of Syndicates not identified in the complaint, have agreed to be bound by a court's decision. *See Chemical Leaman Tank Lines v. Aetna Casualty & Surety Co.*, 177 F.3d 210, 223 (3d Cir. 1999) (finding that when a complaint was amended to sue just one underwriter in his individual capacity rather than "Certain Underwriters," only the individual underwriter's citizenship was relevant to the determination of diversity jurisdiction); *MAve Hotel Invs. LLC v. Certain Underwriters at Lloyd's, London*, 347 F.R.D. 20, 24 (S.D.N.Y. 2024) (holding that when "[p]laintiff amends its [c]omplaint to drop the [n]on-[d]iverse [s]yndicates from [d]efendant [u]nderwriters and add a claim seeking a declaratory judgement against USBTC, in the absence of the [n]on-[d]iverse [s]yndicates, the parties are completely diverse").

Here, Beazley acknowledges that the Policy was insured by both Syndicate 2623 and 623 but avers that it only identified Beazley in the complaint as the sole Name of Syndicate 2623 and has provided no information about the identity of Names of Syndicate 623. (Doc. 75, at 4). Beazley further admits that Syndicate 623 insured 18% of the Policy but nonetheless asserts that Syndicate 623 is not a party to the lawsuit and thus citizenship is irrelevant. (Doc. 75, at 4). Beazley brought this suit on behalf of only itself and in the absence of any claim against or brought by "Certain Underwriters at Lloyd's," the only citizenship relevant for diversity purposes is that of Beazley. *See Chemical Leaman*, 177 F.3d at 223. It is of no significance that the Policy states that "in any suit instituted against any one of [the underwriters] upon this contract," all underwriters "will abide by the final decision." (Doc. 1-

11

1, at 4); *see Chemical Leaman*, 177 F.3d at 223 (finding that diversity jurisdiction existed despite a voluntary agreement in which unnamed underwriters agreed to be bound by a final judgment because the voluntary agreement "did not place before the District Court any of the underwriters not named in the amended complaint"). Accordingly, the Court finds that this matter is properly diverse. *See Chemical Leaman*, 177 F.3d at 223 ("while the absent names would be proper parties to this suit, they are not necessary parties. Complete relief may be accorded to those already parties to the action without impairing or impeding the absent names' ability to protect their interests").

B.    THE POLICY UNAMBIGUOUSLY PROVIDES SCHEDULED COVERAGE

The parties next disagree about whether the Policy provides for scheduled coverage or blanket coverage.[8] (Doc. 54; Doc. 56; Doc. 59). According to Beazley, it is entitled to summary judgment on the issue that the Policy unambiguously provides scheduled coverage for the Building limited to its value in the SOV "because the Scheduled Limit of Liability Clause Endorsement expressly limited liability to '100% of the individually stated value for each scheduled item of property [. . .] at the location which had the loss as shown on the latest

---

[8] As a preliminary matter, it is important to understand the distinction between a scheduled policy and a blanket policy in insurance law. "A blanket[. . .] policy of insurance is written upon a risk as a whole, embracing whatever articles or items are included therein." *Abraxas Grp., Inc. v. Guar. Nat. Ins. Co.*, 648 F. Supp. 304, 305 (W.D. Pa. 1986). "[Blanket insurance] is one that invariably covers and attaches to every item of property described therein. If the loss of one item exhausts the whole amount of the policy, the entire insurance must be paid, and there can be no apportionment. Another definition is that a compound, or blanket, policy is one which insures property collectively without providing in the event of a loss for a distribution of insurance to each item." *Abraxas Grp., Inc.*, 648 F. Supp. at 305-06 (quoting *Reliance Insurance Co. v. Orleans Parish School Bd.*, 322 F.2d 803, 806 (5th Cir. 1963)) (citation omitted). In contrast, a scheduled policy "separately schedules different items of property." *Abraxas Grp., Inc.*, 648 F. Supp. at 306. Under a scheduled policy, "each separately treated item of property is in effect covered by separate contracts of insurance and the amount recoverable with respect to a loss effecting such property is determined independently of the other items of property." *Abraxas Grp., Inc.*, 648 F. Supp. at 306.

Statement of Values.'" (Doc. 59, at 21, 29; Doc. 60 ¶¶ 26, 27, 31, 35, 37, 39-44). MMR and

McConkey also move for summary judgment on the same issue, arguing that the Policy

unambiguously provides blanket coverage because the Supplemental Declarations state that

there is a limit of coverage of "$8,190,598 Per Occurrence" for "All/All" "Prem.No./Bldg.

No." (Doc. 54, at 4-5; Doc. 56, at 15-18). If the Court rejects the "$8,190,598 Per Occurrence"

limit, MMR and McConkey maintain that MMR is owed significantly more under the plain

language of the Policy. (Doc. 54, at 4-5; Doc. 56, at 17-18). McConkey asserts that

alternatively, the "scheduled location" that corresponds to the Building in the SOV—

Location 1—provides blanket coverage for the Building up to $7,312,93. (Doc. 56, at 17-18).

For its part, MMR argues that it is owed $7,770,598, when inclusive of the blanket coverage

for electronic data processing equipment contained in the Building. (Doc. 54, at 4-5, 17-18).

Applying Pennsylvania's contract interpretive principles, the Court holds that the

Policy, when read as a whole, is clearly and unambiguously a scheduled policy. The crux of

this issue turns on this Court's interpretation of the Scheduled Limit of Liability Clause

Endorsement, the portion of the Policy that the parties focused on during oral argument. The

Policy's Scheduled Limit of Liability Clause Endorsement states, in relevant part:

> It is hereby understood and agreed that the following Special Terms and
> Conditions apply to this policy:
>
> (1) The Limit of Liability or Amount of Insurance shown on the
> Supplemental Declarations Page of this policy is a Limit or Amount per
> occurrence. Notwithstanding anything to the contrary contained herein,
> in no event shall the Liability of this Company exceed this Limit or
> Amount in one occurrence, irrespective of the number of Locations
> listed on the Statement of Values which are involved. If no value is
> shown for a scheduled item then there is no coverage for that item.
>
> (2) The premium for this policy is based upon the Statement of Values
> on file with the Company, or attached to this policy. In the event of each
> individual loss hereunder, and subject to any Co-Insurance provisions if

stated within this Policy, the liability of the Company shall be limited to the least of the following for each individual loss:

> A. The actual adjustment amount for each individual loss; or

> B. 100% of the individually stated value for each scheduled item of property, time element or other coverages at the location which had the loss as shown on the latest Statement of Values on file with the Company; or

> C. The Limit of Liability or Amount of Insurance shown on the Supplemental Declarations Page of this Policy or endorsed onto this policy less applicable deductible(s).

This Policy shall not cover for more than any aggregate amount separately stated in respect of specified causes.

(Doc. 60-1, at 56).

The Third Circuit has not yet considered a case determining whether a similar Scheduled Limit of Liability Clause Endorsement provides for blanket or scheduled coverage in the context of an insurance dispute. However, this Court finds several federal matters outside of this Circuit helpful in interpreting the Policy at issue here. In *Forest Oaks Shreveport Apartments, LLC v. W. World Ins. Co.*, the Western District of Louisiana found that "similar references to an SOV on file coupled with a limit of liability endorsement signal that the insurance contract is a scheduled policy." No. CV 20-286, 2021 WL 2534112, at *4 (W.D. La. June 21, 2021). In *RSUI Indem. Co. v. Benderson Dev. Co.*, the Middle District of Florida considered nearly identical language in a limit of liability clause. No. 2:09-CV-88-FTM-29DNF, 2011 WL 32318, at *5 (M.D. Fla. Jan. 5, 2011). The *Benderson Dev. Co* court noted that when a scheduled limit of liability clause "clearly states that it covers 'each scheduled item of property' which has an 'individually stated value[,]'" such "specific language establishes a scheduled policy, rather than a blanket policy." *Benderson Dev. Co.*, 2011 WL 32318, at *5. The Southern District of Mississippi, relying on cases in jurisdictions outside of

14

Mississippi, also found that when "a policy contains a scheduled limit of liability endorsement, and the description of the premises is listed as per schedule on file with the company, a scheduled-rather than blanket-policy is created." *Gulfport-Brittany, LLC v. RSUI Indem. Co.*, No. 107CV1036HSO-JMR, 2008 WL 4951468, at *3 (S.D. Miss. Nov. 7, 2008), aff'd, 339 F. App'x 413 (5th Cir. 2009). The Northern District of New York held that language that limited liability to "one hundred percent of the individually stated value of each scheduled item of property insured as shown on[. . .] the statement of values" indicated unambiguous scheduled coverage. *Knowlton v. Specialty Papers, Inc. v. Royal Surplus Lines Ins. Co.,* No. 03 Civ. 705, at *4 (N.D.N.Y. Oct. 14, 2003).

While not binding upon this Court, the Court finds these cases persuasive. Further, Defendants have not been able to point to any cases where a similar Scheduled Limit of Liability Clause Endorsement which states that the limit of insurance is "the individually stated value for each scheduled item of property" was found to provide blanket coverage. The Court is unpersuaded by Defendants' reliance on *Abraxas Grp., Inc. v. Guar. Nat. Ins. Co.*, which found a policy provided blanket coverage even where the policy included referenced to a "schedule of values." 648 F. Supp. at 307. *Abraxas* is immediately distinguishable because the policy at issue there listed on page one that the amount of insurance to be provided would be "$3,709,267, and this is listed without qualification or reference to any separately valued items," and the "schedule of values" "arrive[d] at a 'Blanket Agreed Amount.'" *Abraxas Grp., Inc.*, 648 F. Supp. at 307. Additionally, the *Abraxas* court was not convinced that the schedule of values was ever incorporated into the policy at all. *Abraxas Grp., Inc.*, 648 F. Supp. at 307. Here, it is undisputed that the Scheduled Limit of Liability Clause Endorsement is included in the Policy, and on the first page, where the limit of insurance is stated as **$8,190,598**, the

Policy also references a "Schedule on File" and the "Limit of Liability Clause." (Doc. 60, ¶ 39; Doc. 60-1, at 26-27; Doc. 67, ¶ 39; Doc. 72, ¶ 39).

Related, bolstering the argument that the parties did not intend the Policy to provide blanket coverage for buildings or properties, is that MMR, through McConkey and RT Specialty, requested that Item (2).B. of the Scheduled Limit of Liability Clause Endorsement be deleted with respects to Business Income & Rental Income, in order to allow business income and rental income to not be limited to a scheduled amount. (Doc. 60, ¶ 47; Doc. 67, ¶ 47; Doc. 60-1, at 241; Doc. 72, ¶ 47). This request was granted, and the Supplemental Declarations Page indeed notes that Item (2).B. of the Scheduled Limit of Liability Clause Endorsement is deleted with respects to Business Income & Rental Income. (Doc. 1-1, at 12-13; Doc. 60-1, at 27). The implication of such a request being made with respect to business and rental income, but not to property or buildings, is that the Scheduled Limit of Liability Clause Endorsement *does* apply to buildings and property, including the Building damaged in the Fire.

The Court is again unpersuaded by Defendants' arguments to the contrary. Defendants rely primarily on one line in the Supplemental Declarations Page for their contention that blanket coverage is provided by the Policy. (Doc. 54, at 4; Doc. 56, at 14). The Supplemental Declarations Page states under "Coverages Provided" that "Insurance at the Described Premises applies for which a Limit of Insurance is shown," and then states that there is a "Limit of Insurance" of "$8,190,598 Per Occurrence" for "All/All" Premises/Buildings. (Doc. 1-1, at 11; Doc. 54, at 4; Doc. 56, at 8-9; Doc. 60-1, at 26). Directly below the chart that includes this limit of insurance quote, there is a bolded box that states: "**Total LIMIT OF INSURANCE in any one occurrence for all above coverages combined:**

**$8,190,598**." (Doc. 60-1, at 26). The Court finds that, reading the Policy as a whole, this clearly indicates that the  limit of insurance of "$8,190,598 Per Occurrence" for "All/All" premises/buildings was meant to convey that if every covered entity was damaged or destroyed, then, subject to the scheduled limits of liability, the most an insured could recover would be $8,190,598, adding together all coverage for all properties or buildings insured. *See Reliance Nat. Indem. Co. v. Lexington Co.*, No. 01 C 3369, 2002 WL 31409576, at *7 (N.D. Ill. Oct. 23, 2002) (finding a scheduled policy exists and rejecting that an insured's argument that the declarations page of an insurance policy which states that there is a limit of insurance of "$8,000,000 per occurrence primary" provides scheduled coverage because other provisions of the policy limited insurance based upon a scheduled locations and "the Statement of Values on file with the Company").

To summarize, the Supplemental Declarations Page, on which Defendants rely, clearly references the Scheduled Limit of Liability Clause, which unambiguously limits Beazley's liability in the Scheduled Limit of Liability endorsement to "100% of the individually stated value for each scheduled item of property, time element or other coverages at the location which had the loss as shown on the latest Statement of Values on file with the Company." (Doc. 60-1, at 56). Accordingly, the Court finds that the Policy unambiguously supports Beazley's position that the Policy provides scheduled coverage. Beazley's motion for summary judgment thus is **GRANTED**.[9] (Doc. 58). Defendants' motions for partial summary judgment are **DENIED** as moot. (Doc. 52; Doc. 55).

---

[9] The parties dispute whether the reasonable expectations doctrine applies to commercial insurance contracts. (Doc. 54, at 5; Doc. 55, at 24-26; Doc. 59, at 30-31). While there are earlier cases in this Circuit where courts have previously applied the reasonable expectations doctrine to commercial insureds, in 2023, the Third Circuit has made clear that the doctrine is unavailable to commercial insureds. *Hemphill v. Landmark Am. Ins. Co.*, No. 20-

C.    THE AMOUNT OF COVERAGE OWED UNDER THE SOV IS LIMITED TO THE VALUE OF LOCATION 1-1

The parties dispute the amount of coverage required under the Policy, even after assuming that the Policy is a scheduled policy. (Doc. 54, at 9-13; Doc. 56, at 15-26; Doc. 59, at 10-11). As described *supra*, Beazley's liability is limited to "100% of the individually stated value for each scheduled item of property, time element or other coverages at the location which had the loss as shown on the latest Statement of Values on file with the Company." (Doc. 60-1, at 56). Thus, the Court must turn to the "latest Statement of Values on file with the Company." (Doc. 60-1, at 56).

First, according to the Policy, the term "the Company" refers to Beazley, as the entity providing this insurance. (Doc. 60-1, at 29). The Court next notes that Defendants claim that the correct statement of values to use for calculating the value of the Building is the statement of values on file with MMR ("MMR SOV"). (Doc. 54, at 4). However, the MMR SOV was never provided to Beazley when MMR applied for coverage for the Policy term or when Beazley approved such coverage, and in fact Beazley and RT Specialty did not receive the

---

2544, 2023 WL 2783249, at *3 (3d Cir. Apr. 5, 2023) (nonprecedential) (stating "[a]n insured's reasonable expectations may occasionally prevail over the express terms of a contract, but only 'in very limited circumstances to protect non-commercial insureds from policy terms not readily apparent and from insurer deception.'") (quoting *Liberty Mutual Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 344 (3d Cir. 2005)). This is a commercial insurance contract and accordingly, the reasonable expectations doctrine does not apply. *Hemphill*, 2023 WL 2783249, at *3. However, the reasonable expectations doctrine would not serve Defendants here regardless. Defendants argue that the Supplemental Declarations page led to MMR's reasonable expectation that the Policy provided blanket coverage. (Doc. 56, at 25). As explained *supra*, on the Supplemental Declarations page states that the "Total LIMIT OF INSURANCE in any one occurrence for all above coverages combined: $8,190,598." (Doc. 60-1, at 26). The reasonable expectation of what this phrase would mean is that if every covered entity was damaged or destroyed in the Fire, then, subject to the scheduled limits of liability, the most an insured could recover would be $8,190,598, adding together all coverage for all properties or buildings insured.

18

MMR SOV until after the Fire. (Doc. 60-1, at 108-109). Because the Policy clearly states that the Statement of Values used to calculate liability limits is the "the latest Statement of Values on file with the Company," the correct Statement of Values to look to is the "'updated [SOV]" [ that McConkey submitted] to RT Specialty on behalf of MMR for the purpose of obtaining insurance," as this was the Statement of Values last on file with Beazley before it bound coverage for the Policy. (Doc. 60-1, at 146). In the SOV, Beazley determined that the damaged property, the Building, was that listed at Location 1-1, valued at $3,413,330, and the value of the business personal property was $440,740. (Doc. 60-1, at 146). Defendants argue that the recovery should be limited to the combined value of both Location 1-1 and Location 1-2, because the Scheduled Limit of Liability Clause Endorsement uses the term "Property" rather than "Building." (Doc. 54, at 9-13; Doc. 56, at 22-24). The Court rejects Defendants' arguments.

The Court finds that the contract language supports the finding that recovery should be limited not on a per location basis but on a per-premise basis. In other words, liability is limited only to the Building damaged, or the limit of recovery listed for Location 1-1 in the SOV. It would be unreasonable to expect that in a scheduled policy, recovery would include damages for properties or buildings not damaged in a fire. *See Geraczynski v. Nat'l R.R. Passenger Corp.*, No. CIV.A. 11-6385 SRC, 2015 WL 4623466, at *5 (D.N.J. July 31, 2015) (stating "[i]n construing an insurance contract, a court must 'search broadly for the probable common intent of the parties to find a reasonable meaning in keeping with the express general purposes thereof.'") (citations omitted). Further, the parties clearly differentiated values, and thus recovery, for two different buildings located at the same address, 1020 Chestnut Road. (Doc. 60-1, at 16). Had the parties intended to combine values, and thus combine recovery limits,

19

for Location 1-1 and Location 1-2, there would have been no reason to delineate between Location 1-1 and Location 1-1. Instead, the parties could have simply found that the address, 1020 Chestnut Road, had one limit of liability, one overall value, and thus one entry for location in the SOV. Additionally, on the Building and Personal Property Form of the Policy, the term "Building" is defined as "the building or structure described in the Declarations" and such definition is listed under the heading titled "Covered Property." (Doc. 60-1, at 29). This suggests that the terms property and building are overlapping, and further, that when the Scheduled Limit of Liability Clause Endorsement uses the term "Property" rather than "Building," the term building is properly considered an item of "Property." (Doc. 60-1, at 56). Therefore, the Court finds that the language of the contract plainly supports the conclusion that the proper coverage limit should be that found under Location 1-1. Accordingly, Beazley's motion for summary judgment will be **GRANTED**. (Doc. 58). Defendants' motions for partial summary judgment are **DENIED** as moot. (Doc. 52; Doc. 55).

## IV.    CONCLUSION

For the foregoing reasons, Beazley's motion for summary judgment will be **GRANTED.** (Doc. 58). Defendants' motions for summary judgment will be **DENIED as moot**. (Doc. 52; Doc. 55).

An appropriate Order follows.

BY THE COURT:

Dated: June 18, 2025                    *s/ Karoline Mehalchick*
                                        **KAROLINE MEHALCHICK**
                                        **United States District Judge**